**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Cheryl Brown,<br>Plaintiff,<br>v.<br>Commissioner of Social Security Administration,<br>Defendant. | No. CV-25-08124-PCT-JAT<br>**ORDER** |

Pending before the Court is Claimant Cheryl Brown's appeal of the Commissioner of the Social Security Administration's ("SSA," or "the Commissioner) denial of social security benefits. (Doc. 16). The appeal is fully briefed (Docs. 16, 18, 19), and the Court now rules. Because the denial properly found certain medical statements to be unsupported and inconsistent with the record, and since it correctly discredited certain testimony, the Court will affirm the Commissioner's decision.

## I. BACKGROUND

Ms. Brown is the surviving spouse of the original claimant in this case, Mr. Corey Brown, and was substituted as the claimant following her husband's passing. (Doc. 10-5 at 69; Administrative Record ("AR") at 186).[1] Mr. Brown had experienced a seizure while driving on January 3, 2016. (AR at 1054). He decided to undergo surgery and died of a pulmonary embolism in October 2020 as a likely result; his doctor had warned him that an embolism and death were possible surgical consequences. (*Id*. at 1030, 6706-09, 7249-51).

[1] The Court collectively refers to the 26 continuously paginated parts found in Doc. 10 as the AR.

Before his passing, Mr. Brown applied for disability benefits in June 2018, alleging a disability onset date of January 3, 2016. (*Id*. at 253, 7300). He last met the insured status requirements on December 31, 2020. (*Id*. at 7303). An Administrative Law Judge ("ALJ") denied the claim and this Court reversed and remanded the matter for further proceedings, (*id*. at 7380, 7400), since the ALJ failed to refute Mr. and Ms. Brown's testimony, as well as the opinion of Mr. Brown's treating physician, (*id*. at 7388-98). On remand, the ALJ again denied the claim in the decision the Court now reviews. (*Id*. at 7300-21).

Before the SSA could grant benefits, Ms. Brown needed to show that her husband was disabled. *See* 42 U.S.C. § 423(a)(1)(E). To be considered under a disability, he could not have engaged in "substantial gainful activity" due to a medically determinable physical or mental impairment. *Id*. § 423(d)(1). This impairment must be severe enough to have stopped him from engaging in any substantial gainful work in the national economy. *Id*. § 423(d)(2). The ALJ consulted the prescribed five-step sequential process created by the SSA when deciding whether Mr. Brown was disabled under this standard. (AR at 7301-02); *see* 20 C.F.R. § 404.1520(a)(1).

Step One of the regulatory test determines whether the claimant had engaged in any substantial gainful activity. *Id*. § 404.1520(a)(4)(ii). To pass this step of the analysis, one cannot perform "significant physical or mental activities" that are usually completed "for pay or profit." 20 C.F.R. § 416.972(a)-(b). Here, the ALJ confirmed that Mr. Brown had not participated in substantial gainful activity since his alleged onset date. (AR at 1356).

Step Two considers if the claimant has a severe "medically determinable physical or mental impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)(4)(ii). To satisfy this step, the impairments must have significantly limited Mr. Brown's "physical or mental ability to do basic work activities." *Id*. § 404.1520(c). The ALJ here found that several of Mr. Brown's conditions qualified as severe physical or mental impairments.[2] (AR at 1356-59).

[2] The ALJ decided that the following conditions satisfied Step Two's threshold: thoracic and cervical degenerative disc disease, epilepsy, migraine, brachial plexitis, bilateral carpal tunnel syndrome, and obesity. (AR at 7303).

Step Three asks whether the claimant's impairments match an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). Absent a match, an ALJ examines the claimant's ability to perform certain physical and mental work despite impairment. *Id*. §§ 404.1545(a)(1), 404.1545 (e). That ability is often referred to as a claimant's "residual functional capacity" ("RFC"). This examination is based on the record and the entirety of the claimant's impairments (including not severe impairments) that can "affect what [the claimant] can do in a work setting." *Id*. §§ 404.1545(a)(1)–(2).

The ALJ here determined that Mr. Brown did not have an impairment that matched one in the Appendix and that he had the requisite RFC to perform light work, albeit with some specified limitations. (AR at 7308-19). To make that finding, she reviewed the record and addressed certain pieces of evidence. On multiple occasions, the ALJ determined that the testimony of either Mr. or Ms. Brown was undercut by other evidence of record. (*Id*. at 7309-14, 7318-19). The ALJ also discussed opinions from medical professionals, including Dr. Kaveh Karandish, who was Mr. Brown's treating physician. (*Id*. at 7314-17).

Step Four identifies whether the claimant's RFC allows for the physical and mental demands of work done "within the past five years that was substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e). The ALJ in this case found that Mr. Brown had no past relevant work and therefore continued to the final step. (AR at 7319).

Step Five considers whether the claimant has the capacity to perform other work given his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(v). If Mr. Brown could have adjusted to other work, he must not be found disabled; if not, he must be found the opposite. *Id*. The ALJ here relied on a vocational expert to conclude that, given the relevant age, education, RFC, and experience, Mr. Brown would have been able to perform the requirements of a significant number of cashiering or clerking jobs. (AR at 7320). She accordingly decided against granting benefits. (*Id*. ta 7321).

## II. LEGAL STANDARD

This Court may set aside the ALJ's decision only if it is "based on legal error or not supported by substantial evidence in the record." *Revels v. Berryhill*, 874 F.3d 648, 654

(9th Cir. 2017) (quoting *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). If at least "more than scintilla but less than a preponderance" of relevant evidence reasonably supports the ALJ's decision, an affirmance is proper. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). The Court consults the entirety of the record when applying this standard. *Id.* (citing *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2007)).

The ALJ—not this Court—is responsible for drawing logical inferences from the medical record, resolving conflicts in medical testimony, determining credibility, and resolving any ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). The ALJ's decision will accordingly be upheld if the relevant evidence subjects it "to more than one rational interpretation." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). Finally, this Court "may not affirm the ALJ on a ground upon which [she] did not rely." *Garrison*, 759 F.3d at 1010.

## III. ANALYSIS

According to Ms. Brown, the ALJ's analysis was legally incorrect for two reasons. She first contends that the ALJ failed to provide sufficient reasons, supported by substantial evidence, for rejecting favorable assessments from Dr. Karandish. (Doc. 16 at 11-17). She then argues that the ALJ did not give specific, clear, and convincing reasons for rejecting the symptom testimony from both Mr. and Ms. Brown. (*Id*. at 17-22).

### A. Dr. Karandish's Medical Opinions

The persuasiveness of a medical statement is determined in consultation with four factors: support from the record, consistency with the record, the relationship between the claimant and the professional, and the professional's specialties. 20 C.F.R. § 404.1520c(c). Of these factors, the first two carry the greatest weight. *Wood v. Kijakazi*, 32 F.4th 785, 791-92 (9th Cir. 2022). The ALJ's explanation of the persuasiveness of Dr. Karandish's opinions must be supported by substantial evidence and articulate how she considered the supportability and consistency factors. *Id*. at 792 (quoting 20 C.F.R. § 404.1520c(b)).

When evaluating Mr. Brown's RFC, the ALJ consulted three statements authored by Dr. Karandish. (AR at 7315-17). The first statement said that Mr. Brown was unable to work, that his pain was severe and distracting, that legs required elevation, and that he was able to occasionally lift and carry less than ten pounds. (AR at 1107-10). The ALJ did not think that this was illuminating. She said that the assertion that Mr. Brown could not work had no value, that Dr. Karandish used undefined terms to describe the RFC, and that the statement did not explain for how long Mr. Brown could not lift his legs. (*Id*. at 7315).

The ALJ likewise discounted the opinion that Mr. Brown could occasionally lift and carry less than ten pounds. This finding, she said, was inconsistent with medical evidence showing normal physical exams and perfect strength tests throughout the relevant period. (*Id*.). She further noted that Dr. Karandish had himself noted normal physical ability and "minimal clinical findings like tenderness and range of motion." (*Id*.).

The second statement conveyed that, not only did pain prevent Mr. Brown from concentrating, but that his disabilities resulted in incoordination, fatigue, and an impaired ability to move, handle objects, or bear weight. (*Id*. at 7213-16). It stated that Mr. Brown uses a cane and recommended that his work should have limitations to accommodate the need for regular treatment, walks, sleep, and the elevation of his legs. (*Id*.). Dr. Karandish explained that Mr. Brown could not lift or carry even less than ten pounds. (*Id*. at 7215).

The ALJ decided that the statement was "inconsistent with the record as a whole." (*Id*. at 7316). Because Mr. Brown was only documented using a cane only five times in 2019 and never in 2018 and 2020, she determined that such use was infrequent. (*Id*.). The ALJ also said that the reported mobility problems were undermined by medical evidence showing normal extremity strength and by Dr. Karandish's own records, which showed full strength in Mr. Brown's upper extremities and that Mr. Brown did not need to elevate his leg. (*Id*.). She noted that the recommended limitations were not justified in the statement or supported by an accompanying physical exam. (*Id*.). In her view, it instead seemed that Dr. Karandish merely checked boxes based on Mr. Brown's reports. (*Id*.).

The third and final statement reported that Mr. Brown had limited arm, hand, and

leg movement resulting in mobility issues and that he had experienced various migraines that would cause absence from work more than four times per month and an inability to deal with stress. (*Id*. at 7217-18). It continued that he had a limited ability to carry objects less than five pounds and could not concentrate for over an hour. (*Id*.).

The ALJ again found that the statement was unsatisfactory. To start, she noted that the terms Dr. Karandish used were undefined and could not easily be used to calculate an RFC. (*Id*. at 7317). Moreover, the ALJ determined that the statement was unclear as to the number of migraines Mr. Brown experienced or which extremities were impaired. (*Id*.). Additionally, the ALJ thought that the percentages reported in the statement measured how often an activity could be performed rather than the degree of limitation.[3] And, as above, the ALJ found that the evidence—including Dr. Karandish's own records—showed normalcy in extremities, the strength thereof, and physicality generally. (*Id*.). The ALJ then noted that Dr. Karandish was again inconsistent about whether Mr. Brown needed to elevate his legs and again seemed to simply record Mr. Brown's reports. (*Id*.).

In the end, the ALJ concluded that Dr. Karandish's statements were "unpersuasive." (*Id*. at 7315-17). Ms. Brown, however, primarily disputes the value of the multiple strength tests that the ALJ relied on to discredit the three statements.[4] (Doc. 16 at 12-16 (citing AR at 704, 734, 747, 788, 791, 876, 885, 1558, 1566, 1574, 1582, 7270, 7284)). Although this accounting appears to be an exhaustive examination of her husband's extremity strength throughout the relevant period, Ms. Brown contends that the use of these muscle-grading tests to contradict the statements was legally insufficient under the second factor.[5] (*Id*.).

She first appears to suggest that Mr. Brown's strength could not be evaluated by a

---

[3] For instance, Dr. Karandish wrote that a limitation of 100% for speech (which is not supported by the record) and a 15% limitation for reaching. (*Id*.).

[4] The Court understands that Ms. Brown's briefing suggests that the ALJ looked at only one report of muscle strength. (Doc. 16 at 12). The ALJ's decision indeed cites the test that Ms. Brown mentions, (AR at 7311 (citing AR at 885)), but it also explicitly references similar tests discussed in previous parts of the decision, *see* (*id*. at 7311-12, 7315-17).

[5] A muscle grading test is "used to detect weakness, aiding in evaluating neuromuscular, musculoskeletal, and neurological conditions; this testing modality plays a crucial role in diagnosing disorders, tracking disease progression, guiding rehabilitation, and evaluating treatment effectiveness." Usker Navki, et al., *Muscle Grading Testing*, STATPEARLS (Apr. 27, 2025), *available at* https://www.statpearls.uk/point-of-care/25393.

muscle grading test due to the nature of his injuries. While "muscle dysfunction" might be a natural fit for such tests, she seems to say, her husband's injury would be better viewed through "electromyography and nerve conduction studies." (*Id*. at 12). The Court, however, is unsure why different types of measurements could not support or undercut the level of Mr. Brown's strength. And Ms. Brown is indeed unable to list legal authority permitting an ALJ to consider grading tests only when evaluating a claimant with muscle dysfunction or a similar disability. *See* (*id*. at 12; Doc. 19 at 6). Because it is reasonable to infer that normal muscle strength testing would not be consistent with a finding that Mr. Brown could not regularly (or ever) lift objects weighing less than ten pounds, the Court finds no error in this regard. *See Andrews*, 53 F.3d at 1039.

Ms. Brown's next argument again tries to erase the ALJ's reliance on the muscle-grading tests, this time saying that they could not signal a claimant's functionality. (Doc. 16 at 12-13). She cites to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(C)(3)(c), which states that the Commissioner "will not use findings on imaging or other diagnostic tests as a substitute for findings on physical examination about your ability to function, nor can we infer severity or functional limitations based solely on such tests." In Ms. Brown's view, muscle-grading tests count as a "diagnostic test" within the meaning of that regulation.

The Court disagrees. The regulation distinguishes diagnostic tests from physical examinations; the former cannot be used to measure functionality while the latter can. *Id*. Caselaw likewise separates the two. *See, e.g.*, *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996) ("Treatment by a physician for physical ailments can often proceed successfully on the basis of a physical examination, objective information supplied by the patient, and the results of diagnostic tests."); *Medina v. Saul*, 840 Fed. App'x 71, 72 (9th Cir. 2020).

Here, Ms. Brown mistakes muscle grading for a diagnostic test when it is actually better viewed as a physical examination. In the medical parlance, and as understood by the courts, a diagnostic test analyzes samples, including blood, urine, and tissue to identify or rule out a condition. *See, e.g.*, *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1128-29 (9th Cir. 2000); *Toutov v. Curative Labs Inc.*, Case No. 2:20-cv-11284-ODW, 2021 WL

3883607, at *2 (C.D. Cal. Aug. 31, 2021). By contrast, a physical examination involves the use of inspection and palpation to determine a patient's reaction. MARK H. SHWARTZ, TEXTBOOK OF PHYSICAL DIAGNOSIS, chap. 6 (8th ed. 2020); *Physical Examination*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (19th ed. 2001). Because a muscle-grading test requires no bodily sample and instead evaluates "key muscles from the upper and lower extremities against the examiner's resistance and grad[es] the patient's strength on a 0 to 5 scale," Navki, et. al. *supra*, the test matches the definition of a physical examination rather than that of a diagnostic test.

Accordingly, Ms. Brown's argument that the ALJ could not consider the tests under § 1.00(C)(3)(c) is wrong. As the muscle-grading results come from physical examinations rather than diagnostic tests, the ALJ could weigh them against Dr. Karandish's statement that Mr. Brown had a severely limited ability to carry or lift objects under ten pounds.[6] *See Nanci R. v. Kijakazi*, No. 21-cv-6295, 2023 WL 9227001, at *3 (N.D. Ill. Dec. 14, 2023) (rejecting imaging but accepting a leg-raising test as evidence of functionality). Other ALJs have also weighed muscle strength against similar findings without error. *See, e.g.*, *Latifu v. Comm'r of Soc. Sec.*, 21 Civ. 884 (KMK) (JCM), 2022 WL 2532193 (S.D.N.Y. May 4, 2022); *Ritchey v. Berryhill*, Case No. 3:18-CV-05237-DWC, 2018 WL 4627297, at *4 (W.D. Was. Sept. 27, 2018).

Ms. Brown takes issue with the ALJ's findings that the last two of Dr. Karandish's statements simply seemed to parrot her husband's own reported symptoms. (Doc. 16 at 16 (citing AR at 7316-17)). Her point is well-taken that such notations are speculative and can therefore not form a basis for which to reject a medical opinion. *See Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995). But here, any error would be harmless because the ALJ did not substitute substantial evidence for her speculation, *See Benecke v. Barnhart*, 379 F.3d

---

[6] Ms. Brown appears to suggest that each muscle-grading score relied on by the ALJ was deficient because they failed to explain how much weight the examiner applied during the tests. (Doc. 16 at 12-13) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(C)(3)(c) ("If your musculoskeletal disorder causes a reduction in muscle strength, the report must document measurement of the strength of the muscles in question.")). But the regulation does not require such a showing; it just requires an examiner to measure the strength of the muscles by administering something like a muscle-grading test.

587, 594 (9th Cir. 2004). She instead supported her conclusions by citations to the medical record and to the statements themselves before even mentioning such speculation. (AR at 7316-17). Because the referenced speculation garnished, not replaced, a thorough analysis of the last two statements, this contention falls flat.

With each of Ms. Brown's arguments considered, the Court concludes that the ALJ adequately addressed the statements. *See* 20 C.F.R. § 404.1520c(c); *Wood*, 32 F.4th at 791-92. The ALJ detailed why she thought that the supporting explanations or evidence from Dr. Karandish were insufficient. *See* 20 C.F.R. § 404.1520c(c)(1). Specifically, each of the statements was pervaded by a lack of detail or rationale, internally inconsistent findings, and undefined terms.[7] (AR at 7316-17). To the extent that Ms. Brown argues that an expert must independently disclaim the statements or affirm the use of muscle-grading tests, *see* (Doc. 16 at 15), she is mistaken; an ALJ may evaluate medical evidence and weigh that evidence against evidence in the record, 20 C.F.R. § 404.1520c(c); *see Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022).

The ALJ also reviewed the consistency of the statements with other evidence of record. *See* 20 C.F.R. § 404.1520c(c)(2). She determined and explained that the statements—which provided grave assessments of Mr. Brown's RFC—were undercut by normal exams and test results from throughout the appeal period, including the strength testing discussed above. (AR at 7316-17). Those determinations, moreover, were supported by substantial evidence in the form of exams reflecting normal physicality and alertness. *See Wood*, 32 F.4th at 792. Given that there is no discernable error with the discussion of supportability or consistency, the Court finds that the ALJ properly determined that the Dr. Karandish statements were unpersuasive.

**B. The Browns' Testimony**

An ALJ may reject testimony about the severity of a claimant's reported symptoms

---

[7] Some of the ALJ's findings of internal inconsistency are not accompanied by any further explanation. *See* (Doc. 16 at 16-17). Yet other findings showing internal inconsistency *are* so supported, especially regarding the need for an elevation of Mr. Brown's legs. (AR at 7316-17). Ms. Brown does not explain why these supported findings of inconsistency are inadequate, nor does she meaningfully refute the ALJ's finding that Dr. Karandish's statements were not detailed and confusingly written.

"only by offering specific, clear, and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)). An ALJ must find "what testimony is not credible and what evidence undermines the claimant's complaints" to satisfy this standard. *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). Other lay testimony may be rejected should the ALJ provide germane reasons for doing so.[8] *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Fain v. Bisignano*, No. 25-3219, 2026 WL 2795427, at *5–6 (9th Cir. Sept. 18, 2026) (confirming the germane reasons test).

Both Mr. and Ms. Brown testified that the relevant disabilities were extreme enough to prevent even light work with limitations. In particular, Mr. Brown explained that he had issues using his hands, feet, and legs that resulted in problems lifting, reaching, sitting, standing, walking climbing, and bending. (AR at 318-23). He and Ms. Brown further said that use of the cane was required due to the referenced problems with mobility. (*Id*. at 52-53, 324). Mr. Brown also said that he had issues getting along with others. (*Id*. at 323).

The ALJ, however, found that normal strength and physicality tests undermine the reports that cane use was a medical necessity, especially given that Mr. Brown was seen with a cane during only one year of his treatment. (*Id*. at 7311-13). Moreover, she explained that many of the reported symptoms conflicted with Mr. Brown's activities. (*Id*. at 7314).

Ms. Brown argues that the ALJ erred when concluding that the Browns' testimony was undermined by the medical evidence. (Doc. 16 at 19-20). She begins by traveling down a familiar road, arguing that muscle strength testing has no place in determining whether a claimant needs a cane. (*Id*. at 19). She once again provides no legal authority for her claim that muscle-grading tests could only be used for cases involving muscle dysfunction. (*Id*.).

---

[8] Even though Ms. Brown is the substitute party, Mr. Brown was the initial claimant. As such, his testimony may be rejected under the "specific, clear, and convincing" standard while Ms. Brown's testimony may be rejected under the lighter "germane reasons" standard. *See Matthews v. Astrue*, No. CIV 09-184-JE, 2010 WL 2803941, at *6-7 (D. Or. June 15, 2010) (rejecting argument that the ALJ was required to provide clear and convincing reasons for discounting the statements by a substituted party following the death of the claimant as the substituted party testified as a lay witness). But, as discussed below, the ALJ properly rejected Mr. and Mrs. Brown's testimony under the stricter standard of review.

Caselaw, however, is replete with examples in which an ALJ unproblematically cited to strength testing to discredit subjective symptom testimony alleging walking issues. *See, e.g.*, *Cloninger v. Bisignano*, No. 25-103, 2026 WL 936134, at *1 (9th Cir. Apr. 7, 2026); *Swanson v. Bisignano*, No. 24-4926, 2025 WL 2779300, at *1 (9th Cir. Sept. 30, 2025). By citing to these and other tests, the Court finds that the ALJ's reasons for rejecting the Browns' testimony were both germane and specific, clear, and convincing.

Next, Ms. Brown cites to instances in the record in which Mr. Brown was noted to ambulate using a cane, arguing that the ALJ's reliance on the evidence documenting a lack thereof was ill-considered. (Doc. 16 at 18-19). But she has not shown that the ALJ's view of the evidence was not a plausible or rational one. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). And she would have difficulty doing so; it is logical to say that repeated visits to a medical professional without the use of cane and normal testing undermines assertions of severely impaired mobility. Thus, the Court finds that the ALJ's understanding of medical evidence was plausible and provided germane, specific, clear, and convincing reasons for rejecting the testimony. *Lingenfelter*, 504 F.3d at 1036.

The last of Ms. Brown's arguments concerns the ALJ's reasoning that Mr. Brown's hobbies and activities conflict with the testimony. (Doc. 16 at 21). In general, she seems to say that the ALJ laid an improper foundation when considering these hobbies and activities. (*Id.*). Although "participation in everyday activities" that are transferrable to a work setting may be weighed against symptom testimony, *Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012), many activities are not transferrable to the workplace, "where it might be impossible to periodically rest or take medication," *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Ms. Brown's argument is presented as encompassing the entirety of the ALJ's discussion of daily activities, but her analysis only focuses on those activities that the Court mentions below. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (holding that reviewable arguments must be made in the opening brief).

On the whole, Ms. Brown's understanding of the legal standard would require an ALJ to provide quantified information concerning each activity at issue. For instance, she

argues that the ALJ erred by not addressing how *often* Mr. Brown worked on his truck, how *many* sculptures he worked on, how *often* he used a remote-control car, and how *often* he rototilled his yard. (Doc. 16 at 21). Ms. Brown's argument relies entirely on *Trevizo v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017). *See* (Docs. 16 at 21; 19 at 3-4). In that case, the Ninth Circuit Court of Appeals decided that "childcare" could not undermine testimony when nothing in the record described either the duties of that childcare or their frequency and duration. *Trevizo*, 871 F.3d at 676, 682.

But this case is different from *Trevizo*. Here, the activities that Mr. Brown engaged in are specific and self-contained. Whereas "childcare" might concern many activities like school trips, cooking, and bathing, activities like "rototilling" and "sculpting" are not.[9] The Ninth Circuit itself understood the *Trevizo* decision not to require timestamps for any given activity; just that such activities must be reasonably identifiable from the record. *See Alo v. Berryhill*, 766 Fed. App'x 512, 514 (9th Cir. 2019) (holding that, whereas Trevizo's tasks were "not clear from the record," tasks like "cooking, as well as dressing and bathing her children with her husband" were clear enough for the ALJ to consider). Nowhere did the court require the ALJ to explain how often the claimant dressed, bathed, or cooked.

Here, the Court finds no error with the ALJ's analysis of Mr. Brown's activities. Although the record did not explain how often Mr. Brown engaged in these activities, there is no rule requiring such a frequency check. *See Alo*, 766 Fed. App'x at 514 (discussing a claimant's cooking, bathing, and dressing); *Marshall v. Comm'r of Soc. Sec.*, No. CV-24-03155-PHX-MTL; 2026 WL 73799, at *4 (D. Ariz. Jan. 9, 2026) (discussing dancing, laundry, and cooking). Ms. Brown makes no other objection to the ALJ's determinations regarding her husband's activities, and she would be hard-pressed to do so. The ALJ listed each activity and described exactly which testimony it conflicted with. *See Ghanim*, 763

---

[9] Ms. Brown seems to imply that the record is unclear as to whether she or Mr. Brown rototilled the garden. (Doc. 16 at 21 (citing AR at 3416)). The record, however, says "[r]ototilled garden area. Is buying a remote controlled car . . . ." Since Ms. Brown accepts that her husband had a remote-controlled car hobby, and does not affirmatively state that she rototilled the garden, it follows that the record is describing that Mr. Brown both rototilled the garden and bought such a car. But even if it is unclear, the ALJ's interpretation of the record is beyond plausible.

F.3d at 1163; (AR at 7314 (explaining, for instance, that rototilling suggests an ability to handle or reach, and that sculpting conflicted with statements that he could only sleep, look at the garden, and watch television)). Thus, the Court finds that the ALJ provided germane, specific, clear, and convincing reasons, bolstered by substantial evidence, to disregard the symptom testimony offered by Mr. and Ms. Brown. *See Lingenfelter*, 504 F.3d at 1036.

## IV. CONCLUSION

The ALJ's decision presents an exhaustive accounting of evidence and reasoning. It explained why each of Dr. Karandish's statements was unsupported and inconsistent with the evidence and therefore unpersuasive. It also detailed why Mr. and Ms. Browns' symptom testimony was contradicted by the evidence. Ms. Brown's arguments against the decision, however, failed to demonstrate the presence of any harmful error therein.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

Dated this 24th day of September, 2026.

James A. Teilborg
Senior United States District Judge